# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>frumpy.powder-0b@icloud.com that is within the<br>possession, custody, or control of Apple, Inc. | )<br>)<br>)<br>)<br>)<br>) |

Case No. **2:23-MJ-01623**

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-2*

There are now concealed or contained the items described below:

*See Attachment B-2*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire |
| 18 U.S.C. § 373(a) | Solicitation to Commit a Crime of Violence |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

/s/ Craig Meekins,  FBI SA
*Applicant's signature*

FBI Special Agent Craig Meekins
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State:     Los Angeles, CA

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Judge's signature*
*Printed name and title*

AUSA: Elizabeth Douglas (x5728)

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with SUBJECT ACCOUNT 3 identified as frumpy.powder-0b@icloud.com, and specifically including associated iCloud and iTunes accounts, that is within the possession, custody, or control of Apple Inc., a company that accepts service of legal process at One Apple Park Way, M/S 169-5CLP, Cupertino, California 95014-2084, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B-2**

**ITEMS TO BE SEIZED**

I.   **SEARCH PROCEDURES**

1.    The warrant will be presented to personnel of Apple, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide the Section II information in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.13.a. below), law enforcement agents and/or other individuals assisting law enforcement agents who are not participating in the investigation of the case and who are assigned as the "Privilege Review Team" will review the content records, according to the procedures set forth herein, to determine whether or not any of the content records appears to contain or refer to communications between an attorney, including Peter Johnson, Ryan Sakacs, and Michael Brown, or to contain the work product of an attorney and any person ("potentially privileged information").  The "Search Team" (law

enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search) will review only content records which have been released by the Privilege Review Team.  With respect to the non-content information produced by the PROVIDER (see Section II.13.b. below), no privilege review need be performed and the Search Team may review immediately.

5.   The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for in the content records, to include specific words like "Peter Johnson," "Ryan Sakacs," and "Michael Brown," or their email addresses, and generic words such as "privileged" or "work product".  The Privilege Review Team will conduct an initial review of all of the content records by using the privilege key words, and by using search protocols specifically chosen to identify content records containing potentially privileged information.  Content records that are not identified by this initial review as potentially privileged may be given to the Search Team.

6.   Content records that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information.  Content records determined by this review not to be potentially privileged may be given to the Search Team. Content records determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a Privilege Review Team Attorney ("PRT Attorney").  Content records identified by the PRT Attorney

after review as not potentially privileged may be given to the Search Team.  If, after review, the PRT Attorney determines it to be appropriate, the PRT Attorney may apply to the court for a finding with respect to particular content records that no privilege, or an exception to the privilege, applies.  Content records that are the subject of such a finding may be given to the Search Team.  Content records identified by the PRT Attorney after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

7.   The Search Team will search only the content records that the Privilege Review Team provides to the Search Team at any step listed above in order to locate, extract and seize content records that are within the scope of the search warrant (see Section III below).  The Search Team does not have to wait until the entire privilege review is concluded to begin its review for content records within the scope of the search warrant.  The Privilege Review Team may also conduct the search for content records within the scope of the search warrant if that is more efficient.  The search may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

8.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

9.    The Privilege Review Team and the Search Team will complete the search of non-content information and both stages of the search of the content records discussed herein as soon as is practicable but not to exceed 180 days from the date of receipt from the PROVIDER of the response to this warrant.   The government will not search the records beyond this 180-day period without first obtaining an extension of time order from the Court.

10.   Once the Privilege Review Team and the Search Team have completed their review of the non-content information and the content records and the Search Team has created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the Search Team for authenticity and chain of custody purposes -- until further order of the Court.   Thereafter, neither the Privilege Review Team nor the Search Team will access the data from the sealed original production which fell outside the scope of the items to be seized or was determined to be privileged absent further order of the Court.

11.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

12.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.  **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

13.  To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.  All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between July 14, 2021, and the date of this warrant,[8] including:

i.  All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

---

[8] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

ii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All search history and web history, including web clicks or "History Events," by the user of the SUBJECT ACCOUNT;

iv.  All web browsing activities that are identifiable with the SUBJECT ACCOUNT;

v.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b.  All other records and information, including:

i.  All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes**

**made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

    (I)   the SUBJECT ACCOUNT.

    (II) any other account associated with the SUBJECT ACCOUNT, including by means of sharing a common secondary, recovery, or alternate **email address listed in subscriber records** for the SUBJECT ACCOUNT or by means of sharing a **common phone number or SMS number listed in subscriber records** for the SUBJECT ACCOUNT, and any account that lists the SUBJECT ACCOUNT as a secondary, recovery, or alternate email address.

    (III)    any other account associated with the cookie(s) associated with the SUBJECT ACCOUNT.

    ii.  Any and all cookies used by any computer or web browser associated with the SUBJECT ACCOUNT, including the IP addresses, dates, and times associated with the recognition of any such cookie;

    iii. All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.13.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

III. <u>**INFORMATION TO BE SEIZED BY THE GOVERNMENT**</u>

14.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.   All information described above in Section II.13.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1958 (Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire) and 18 U.S.C. § 373(a) (Solicitation to Commit a Crime of Violence) (the "SUBJECT OFFENSES"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.  Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii. Documents, records, messages communications, audio recordings, pictures, video recordings, or still captured images: regarding Victim W.D., the dark net, the dark web, Tor network, Onion sites, soliciting murder, soliciting a crime of violence, Bitcoin, and cryptocurrency;

iv.  Records, information, and Internet searches related to Victim W.D., including but not limited to photographs, videos, drawings, depicting the likenesses of Victim W.D., their relatives, neighbors, co-workers, or friends;

v.   Documents, records, messages communications, audio recordings, pictures, video recordings, or still captured images referring to or containing the personal identifying information of victim W.D. or any relative of victim W.D., such

viii

as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, and email addresses.

vi.   Records, information, and Internet searches or activity regarding murder, murder-for-hire, alibis, hitmen, the dark net, the dark web, Tor network, Onion sites, soliciting murder, soliciting a crime of violence, Bitcoin, and cryptocurrency;

vii. Records, information, and Internet searches or activity related to threats to commit, or the commission of acts of physical violence against others;

viii.   Records and information related to the use of instant and social media messages, email communications, or other communications in connection with the Subject Offense;

ix.   Records and information related to the use of the dark web and any accounts used or controlled by CODA on the dark web or dark net;

x.   Bitcoin records, keys, and records relating to the purchase, exchange, or sale of digital currency, including Bitcoin;

xi.   Solicitation of or instructions to send wires, money service payments, bank transfers, cash payments, gift card payments, or other financial transactions;

b.   All records and information described above in Section II.13.b.

## IV.  <u>**PROVIDER PROCEDURES**</u>

15.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

> Special Agent Craig Meekins
> 4811 Airport Plaza Dr. Suite 500
> Long Beach, CA 90815
> Phone: (323) 229-5862
> Fax: (562) 982-1798
> Email: ctmeekins@fbi.gov

16.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

x

## AFFIDAVIT

I, Craig Meekins, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since December 2021.  I am currently assigned to the Los Angeles Field Division, Long Beach Resident Agency Violent Crime Squad, which is responsible for investigating kidnappings, extortion, bank robberies, Hobbs Act violations, and other violent crimes.

2.   Since becoming an FBI Special Agent, I have received formal training at the FBI Training Academy in Quantico, Virginia.  This training included segments on conducting criminal investigations, narcotics identification, organized crime, and other law enforcement topics.  During the time I have been employed by the FBI, I have participated in investigations relating to extortion, crimes against children, drug trafficking, organized crime and gangs, and violent crimes.  I have participated in many aspects of criminal investigations, such as, but not limited to, reviewing evidence, the issuance of subpoenas, the analysis of pen and trap and trace records, consensually monitored telephone calls, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.  In addition, I have received both formal and informal training from the FBI and other institutions regarding computer-related investigations and computer technology.

3.    I make this affidavit in support of an application for
a warrant for information associated with the following email
accounts:

a.    The email account identified as
gigibombelle@gmail.com ("SUBJECT ACCOUNT 1"), which is stored at
premises controlled by Google LLC, a provider of electronic
communication and remote computing services, headquartered at
1600 Amphitheatre Parkway, Mountain View, CA 94043,[1] as further
described in Attachment A-1.

b.    The email account identified as
julzcoda@gmail.com ("SUBJECT ACCOUNT 2"), which is stored at
premises controlled by Google LLC, a provider of electronic
communication and remote computing services, headquartered at
1600 Amphitheatre Parkway, Mountain View, CA 94043, as further
described in Attachment A-1.

c.    The email account identified as frumpy.powder-
0b@icloud.com ("SUBJECT ACCOUNT 3"), which is stored at premises
controlled by Apple, Inc., a provider of electronic

---

[1] Because this Court has jurisdiction over the offense(s)
being investigated, it may issue the warrant to compel the
PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).
See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the
disclosure by a provider . . . pursuant to a warrant issued
using the procedures described in the Federal Rules of Criminal
Procedure . . . by a court of competent jurisdiction") and 2711
("the term 'court of competent jurisdiction' includes -- (A) any
district court of the United States (including a magistrate
judge of such a court) or any United States court of appeals
that -- (i) has jurisdiction over the offense being
investigated; (ii) is in or for a district in which the provider
of a wire or electronic communication service is located or in
which the wire or electronic communications, records, or other
information are stored; or (iii) is acting on a request for
foreign assistance pursuant to section 3512 of this title").

communication and remote computing services, headquartered at 1
Apple Park Way, Cupertino, CA 95014, as further described in
Attachment A-2.  SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, and
SUBJECT ACCOUNT 3 are collectively referred to herein as the
"SUBJECT ACCOUNTS," and Google LLC and Apple, Inc. are
collectively referred to herein as the "PROVIDERS."

    4.    This affidavit is made in support of an application
for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A),
2703(c)(1)(A) and 2703(d)[2] to require the PROVIDERS to disclose
to the government copies of the information (including the
content of communications) described in Section II of
Attachments B-1 and B-2.  Upon receipt of the information
described in Section II of Attachments B-1 and B-2, law
enforcement agents and/or individuals assisting law enforcement
and acting at their direction will review that information to
locate the items described in Section III of Attachments B-1 and

---

[2] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).  To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To
obtain additional records and other information -- but not
content -- pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The
requested warrant calls for both records containing content (see
Attachments B-1 and B-2 paragraph II.13.a.) as well as
subscriber records and other records and information that do not
contain content (see Attachments B-1 and B-2 paragraph
II.13.b.).

B-2.  Attachments A-1, A-2, B-1, and B-2 are incorporated herein by reference.

5.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 1958 (Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire) and 18 U.S.C. § 373(a) (Solicitation to Commit a Crime of Violence).

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.    Beginning on an unknown date, but no later than on or about February 3, 2022, and continuing until on or about March 1, 2022, JULIA BETH CODA, also known as ("aka") JULIA BETH TAUS, aka "Bonfire," aka "Gigi Bombelle" ("CODA"), while in the Central District of California, solicited the murder of victim W.D., who resides in Louisiana, via the dark web and sent Bitcoin as payment for victim W.D.'s murder.

4

8.    Prior to soliciting victim W.D.'s murder via the dark web, between July to December 2021, CODA (using both the alias "Gigi Bombelle" and her real name) contacted the FBI and made unsubstantiated claims that W.D. and others had engaged in criminal activity.  In those communications, CODA provided SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 to the FBI as email accounts she used.

9.    On January 13, 2022, CODA used SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 3 to register for two Bitcoin wallets with Coinbase.  She then used the Bitcoin wallet associated with SUBJECT ACCOUNT 3 to send Bitcoin as payment for victim W.D.'s murder.  For the Bitcoin wallet associated with SUBJECT ACCOUNT 1, CODA provided the alias "Julz Coda" to Coinbase as her name. This alias is similar to SUBJECT ACCOUNT 2: julzcoda@gmail.com.

10.    On or about May 31, 2022, during a recorded interview with the FBI, CODA admitted to soliciting the murder of victim W.D. via the dark web and to sending Bitcoin as payment for victim W.D.'s murder using a Bitcoin wallet associated with SUBJECT ACCOUNT 3.

11.    On or about October 14, 2022, the Grand Jury returned an indictment in the Central District of California charging CODA with soliciting the murder of victim W.D., in violation of 18 U.S.C. § 1958 (Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire).  See United States v. Coda, No. 2:22-cr-00474-JLS.  CODA committed the alleged offense over the internet while residing in the Central District of California.

### III.  STATEMENT OF PROBABLE CAUSE

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   July – December 2021: CODA Contacts the FBI Using the Alias "Gigi Bombelle"

13.  Based on my review of FBI Special Agent Christine DeLeon's notes and reports, I know that on or about July 14, 2021, an individual (later identified as CODA) submitted an online tip to the FBI National Threat Operations Center using the alias "Gigi Bombelle."

14.  In the tip, "Gigi Bombelle" claimed that an individual G.T. and his brother illegally distributed drugs and engaged in other crimes including murder, kidnapping, extortion, bribery, human trafficking, and "dealing in obscene matter."

15.  Through the online tip portal, "Gigi Bombelle" self-reported that her date of birth was August 5, 1982, her cell phone number was 310-514-6265 (the "-6265 Number"), her email address was gigibombelle@gmail.com (SUBJECT ACCOUNT 1), and her zip code was 90275.  Subscriber records indicate that the "-6265 Number" number belongs to CODA.

16.  Based on my review of Special Agent DeLeon's notes and reports, I know that on or about August 10, 2021, Special Agent DeLeon interviewed "Gigi Bombelle" telephonically.  "Gigi Bombelle" confirmed that her date of birth was August 5, 1982, her cell phone number was the -6265 Number, and her email address was gigibombelle@gmail.com (SUBJECT ACCOUNT 1).  "Gigi

Bombelle" told Special Agent DeLeon, in part, that G.T. and P.M. were working together in an ongoing drug trafficking scheme. "Gigi Bombelle" said that this scheme had led to the wrongful death of G.T.'s daughter and that G.T. had then kidnapped his grandchild and may have taken him/her to Louisiana. "Gigi Bombelle" was not able to provide the FBI any credible information corroborating her claims of criminal activity.

17.   Based on my review of Special Agent DeLeon's notes and reports, I know that on or about December 17, 2021, Special Agent DeLeon interviewed CODA telephonically.  CODA admitted that she had previously contacted the FBI using the alias "Gigi Bombelle."  CODA stated that her date of birth was August 5, 1982, her phone number was the -6565 number, and that her email address was julzcoda@gmail.com (SUBJECT ACCOUNT 2).

18.   CODA also told Special Agent DeLeon, in part, that G.T. was her father and G.T.'s daughter -- J.T. -- was her sister.  In this interview, CODA said that J.T.'s child, B.T., had been kidnapped not by G.T., but by B.T.'s biological parent W.D. who lived in Louisiana.  CODA told Special Agent DeLeon that the abduction was a "legal abduction" because W.D. was B.T.'s parent.  CODA further stated that she had only limited contact with B.T. since the "kidnapping."  CODA was not able to provide the FBI any credible information corroborating her claims of criminal activity.

**B.     February 23, 2022: An Anonymous Source Contacts the FBI Regarding a Murder-for-Hire Plot**

19.  Based on my conversations with FBI Special Agent Matthew Parker and FBI Special Agent Clay Anderson and my review of their notes and reports, I know that on or about February 23, 2022, a confidential human source of information (the "Source")[3] contacted Special Agent Anderson with information that s/he believed involved a threat to life.

20.  Specifically, the Source indicated that another individual (the "Sub-Source") informed him/her that a person named W.D. was the target of a murder-for-hire plot by a user named "Bonfire" on an online Dark Web murder-for-hire site (the "Dark Website").[4]  Based on my conversations with Special Agent Parker and Special Agent Anderson, I know that the Source, who was in direct contact with Special Agent Anderson, refused to provide Special Agent Anderson the Sub-Source's identity.  The Source told Special Agent Anderson that the Sub-Source at one

---

[3] The identity of the Source is known to the FBI.  Based on my conversations with Special Agent Anderson, I understand that the Source has provided reliable information to the FBI in the past.

[4] From my training and experience, and from my discussions with other FBI Special Agents, I am aware that the "dark web," also sometimes called the "darknet," "dark net" or "deep web," is a colloquial name for a number of extensive, sophisticated, and widely used criminal marketplaces operating on the Internet, which allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply "web").  These online black-market websites use a variety of technologies, including the Tor network and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring.  Users access such sites from their digital devices, including cell phones, laptops, and computers.

point had administrative access to the Dark Website and was therefore, able to access its contents due to his administrator status.[5]  This affidavit does not rely on any information provided by the Sub-Source to establish probable cause for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d) to require the PROVIDERS to disclose to the government copies of the information (including the content of communications) described in Section II of Attachments B-1 and B-2, and recites information provided by the Sub-Source via the Source only as background to explain the subsequent investigative steps taken by the FBI in this case.

21.  The Source provided law enforcement with the information from the Sub-Source, which included W.D.'s full name, address, and physical description, which were included in an online order soliciting W.D.'s murder, which was submitted by

---

[5] Based on my conversations with Special Agent Anderson, I know that any information Special Agent Anderson received from the Sub-Source, via the Source, he corroborated to the extent possible and found it to be truthful.  Although Special Agent Anderson has not been able to verify the identity of the sub-source, I am aware from conversations with Homeland Security Investigations ("HSI") Special Agent Heidi Whereatt that she has been in direct contact with an individual who claims to be the Sub-Source ("HSI Source").  I am also aware, from conversations with Special Agent Whereatt and my review of internal FBI reports, that in 2018 the FBI considered working with the HSI Source as a confidential human source, but chose not to due to concerns about controlling the HSI Source's activities.  Based on my conversations with Special Agent Whereatt, I am aware that the HSI Source has a criminal record in another country from within the last ten years involving child pornography.  The HSI Source also obtained information from the Dark Website by hacking into the Dark Website, and was not an administrator. The HSI Source provided information to HSI pursuant to a proffer agreement, but he did not receive payment from HSI.  Information Special Agent Whereatt received from the HSI Source was corroborated to the extent possible and found to be truthful.

an individual using the alias "Bonfire" on the Dark Website. The Source also provided the content of online messages and posts from the Dark Website in a Word document that the Source said came from the Sub-Source, in which "Bonfire" requested, among other things, that hitmen from the Dark Website murder W.D. and make it look like an accidental drug overdose.  Lastly, the Source provided information from six Bitcoin transactions that the Sub-Source had obtained from the Dark Website, which the Source told the FBI were related to "Bonfire's" request for W.D.'s murder.

22.  Based on my conversations with Special Agent Parker and Special Agent Anderson and my review of their notes and reports, as well as my conversations with Special Agent Whereatt, who has been investigating the Dark Website, I know that, at the time CODA accessed it, the Dark Website advertised murder-for-hire services, however, the administrators of the Dark Website did not actually arrange murders for hire. Instead, the supposed "hitmen" on the Dark Website would correspond with people seeking murder-for-hire services and accept and keep payment for the services, without arranging to murder (or attempting to murder) anyone.

C.  **February 14, 2022, to February 18, 2022: CODA Transfers Bitcoin to Pay for the Murder of Victim W.D.**

23.  Based on my conversations with Special Agent Parker and Special Agent Anderson and my review of their notes and reports, I know that after the FBI received the tip regarding

"Bonfire," the FBI then investigated the Bitcoin transaction information provided by the Source and the Sub-Source.

24.   Based on my conversations with Special Agent Parker and Special Agent Anderson, I know that Special Agent Anderson was able to trace the sender of the Bitcoin transfers to an account associated with CODA.  Specifically, based on an analysis of the Bitcoin blockchain used in the transaction using an open-source tool known as "Blockchain Explorer," Special Agent Anderson was able to determine that the Bitcoin wallet used in the transactions was a Coinbase wallet.  Coinbase is a Bitcoin exchange service.

25.   Coinbase provided the FBI with the name of the owner of the Bitcoin wallet that was responsible for the six Bitcoin transactions identified by the Source and Sub-Source (the "First Coinbase Wallet").  The information provided by Coinbase showed CODA listed as the owner of the First Coinbase Wallet and showed the six transactions made by CODA that had been identified by the Source and Sub-Source.  Coinbase also provided the registration information for the First Coinbase Wallet, which included CODA's name, address, date of birth, driver's license number, social security number, phone number, and email address. Coinbase further provided the bank account number used to purchase the Bitcoin, which was registered in CODA's name.  The email address for the First Coinbase Wallet was fumpy.powder-0b@icloud.com (SUBJECT ACCOUNT 3).  The First Bitcoin Wallet was created on January 13, 2022.

26.   I have compared the registration information for the
First Coinbase Wallet provided by Coinbase to the information
that CODA provided to Special Agent DeLeon in 2021 (both while
posing as "Gigi Bombelle" and while using her real name).   Based
on that comparison, I know that the zip code, date of birth, and
phone number for the First Coinbase Wallet matched the
information that CODA provided to the FBI in 2021.

27.   Based on my conversations with Special Agent Parker
and Special Agent Anderson and my review of their notes and
reports, I know that from on or about February 14, 2022, to
February 18, 2022, CODA sent approximately $9,848.41 USD in
Bitcoin from the First Bitcoin Wallet to a recipient whose
Bitcoin wallet shared similar characteristics as other Bitcoin
wallets that Special Agent Anderson had identified as being
associated with the administrators of the Dark Website.

28.   Coinbase also provided the FBI information regarding
another Bitcoin Wallet (the "Second Coinbase Wallet") that CODA
attempted to create on January 13, 2022: the same day she
registered for the First Coinbase Wallet.   Coinbase provided the
registration information for the Second Coinbase Wallet.   CODA
used the same date of birth, driver's license number, social
security number, and phone number to register for the Second
Coinbase Wallet as she used to register for the First Coinbase
Wallet.   The email address for the Second Coinbase Wallet was
SUBJECT ACCOUNT 1: gigibombelle@gmail.com.   The Second Coinbase
Wallet was registered under the name "Julz Coda."   The address
for the Second Coinbase Wallet was 2205 Farrell Avenue,

Apartment 103, Redondo Beach, CA 90278 (the "Redondo Beach
Apartment").

29.  I have compared the registration information for the
Second Coinbase Wallet provided by Coinbase to the information
that CODA provided to Special Agent DeLeon in 2021 (both while
posing as "Gigi Bombelle" and while using her real name).  Based
on that comparison, I know that the date of birth, phone number,
and email address for the Second Coinbase Wallet matched the
information that CODA had provided to the FBI in 2021.  The name
used to register the Second Coinbase Wallet -- "Julz Coda" -- is
similar to one of the email addresses CODA provided to the FBI
in 2021: julzcoda@gmail.com (SUBJECT ACCOUNT 2).

   D.   **February 24, 2022: The FBI Interviews Victim W.D.**

30.  Based on my conversations with Special Agent Parker
and Special Agent Anderson and my review of their notes and
reports, I know that the FBI located an individual meeting the
description of W.D. that had been provided by the Source and the
Sub-Source.

31.  On or about February 24, 2022, FBI Special Agents
interviewed victim W.D. at the FBI Baton Rouge Resident Agency
in Baton Rouge, Louisiana.  The interview was conducted at the
FBI office in Baton Rouge because it is the closest one to
Victim W.D.'s current residence.  At the start of the interview,
the agents advised victim W.D. that s/he was being interviewed
because someone was attempting to take a hit out on him/her via
the dark web.  Victim W.D. was not surprised that a threat had
been made against his/her life.  Before s/he was notified of the

potential suspect, victim W.D. stated that CODA had a vested
interest in having him/her killed.  Interviewing agents showed
victim W.D. a driver's license photo of CODA, and s/he confirmed
that that was the individual s/he was afraid of.

### E.  March 1, 2022: An FBI Agent Acting Undercover as the Purported Hitman Exchanges Messages with CODA and "Molly Blu"

32.  Based on my conversations with Special Agent Parker
and my review of his notes and reports, I know that on or about
March 1, 2022, an FBI agent acting in an undercover capacity
(the "UC Agent") sent text messages to the -6265 number.  As
stated above, subscriber records indicate that the "-6265
Number" number belongs to CODA.

33.  In the text messages to CODA's telephone number, the
UC Agent pretended to be the hitman.

> **03/01/2022 at 7:37 am from the UC Agent to CODA**
> Bonfire?

> **03/01/2022 at 8:03 am from CODA to the UC Agent**
> ?Wrong number

> **03/01/2022 at 8:19 am from the UC Agent to CODA**
> Do you have WhatsApp or signal. I have the right number

> **03/01/2022 at 8:57 am from the UC Agent to CODA**
> Check other for pics

> **03/01/2022 at 3:38 pm from the UC Agent to CODA**
> look at the pics?

> **03/01/2022 at 9:11 pm from the UC Agent to (310) CODA**
> Give me a response to the pics

34.  That same day, March 1, 2022, the UC Agent received a
text message from a telephone number ending in -8234 (the "-8234

Number") through the Signal application, which identified the user as "Molly Blu." Subscriber records indicate that this phone number belongs to an individual M.B.[6]

> **03/01/2022 at 8:41 am from the -8234 Number to the UC Agent**
> Bonfire?

> **03/01/2022 at 8:43 am from the UC Agent to the -8234 Number**
> Yes. This is better.
> Let's talk when you are private. When will u be able to.

35. The -8234 Number called the UC Agent. This call was audio-recorded, and I have listened to the recording. The woman who called the UC Agent from the -8234 Number identified herself as "Bonfire." The UC Agent said he was her point of contact for their "business." The woman denied any knowledge of having any "business" with the UC Agent and said she did not know who he was. She also denied knowing about a Bitcoin transaction or a website. She said that "Bonfire" was just a name she used. The woman asked the UC Agent how he got her phone number. The phone line then had static and disconnected. Although the UC Agent tried to call the -8324 Number back multiple times, no one picked up.

**F.   May 31, 2022: The FBI Interviews CODA at the Redondo Beach Apartment**

36. Based on my conversations with Special Agent Parker and my review of his notes and reports as well the audio recording of his interview of CODA, I know that Special Agent Parker conducted an in-person interview with CODA at the Redondo Beach Apartment on May 31, 2022, which was audio recorded.

---

[6] This individual's name is similar to "Molly Blu" but is not Molly Blu.

      1.   <ins>CODA Admits Contracting with the Dark Website to Kill W.D.</ins>

37.  During her interview, Special Agent Parker showed CODA messages that "Bonfire" had sent to the Dark Website (which had been provided to the FBI from the Source who had received it from the Sub-Source).  CODA admitted that she had contacted the Dark Website and used the username "Bonfire."  She stated that she had initially asked about hacking victim W.D.'s phone before ultimately requesting that someone kill victim W.D. while making it look like an accidental overdose on heroin or other drugs.  Special Agent Parker showed CODA the photograph that CODA had attached to the murder order (which had also been provided to the FBI from the Source who had received it from the Sub-Source), and she identified the person pictured as victim W.D.

38.  CODA also admitted that she had sent Bitcoin to someone in early 2022 to have victim W.D. killed.  Special Agent Parker showed CODA a picture of the driver's license provided by Coinbase for First Coinbase Wallet described above.  CODA confirmed that it was her license and that she had sent the photos to Coinbase to open the Coinbase account.  CODA also confirmed she used SUBJECT ACCOUNT 3 (frumpy.powder-0b@icloud.com) with her Coinbase account, which matched the information provided by Coinbase for the First Coinbase Wallet.

39.  CODA also admitted that she conducted multiple Internet searches at the time she was looking to hire a hitman and may have visited other websites related to murder-for-hire.

2.   <u>CODA Admits She Was Contacted by Someone She
     Thought Was the Hitman</u>

40.   During her interview, CODA also admitted she was
contacted by a person she thought was the hitman from the Dark
Website.  As described above, this individual was, in fact, the
UC Agent.

41.   CODA said she had responded to the UC Agent that s/he
had a wrong number.  She also stated that she had a phone call
with the UC Agent using her business partner, M.B.'s, Signal
account.  She said that she and M.B. put the UC Agent on
speakerphone.  CODA said that M.B. was not aware of the murder-
for-hire plot.  CODA had instead told M.B. that the UC Agent was
someone who was bothering her, and asked M.B. to help her tell
the UC Agent not to contact her anymore.

42.   CODA provided M.B.'s telephone number to Special Agent
Parker and it was the same number as the -8324 Number.

43.   CODA admitted that after she was contacted by the UC
Agent, she had reached out to the Dark Website again.  At that
time, she had sought to cancel the murder contract and get her
money back.

**G.   October 14, 2022: The Grand Jury Charges CODA with
      Violating 18 U.S.C. § 1958 (Use of Interstate Commerce
      Facilities in the Commission of Murder-for-Hire)**

44.   On or about October 14, 2022, the Grand Jury returned
an indictment in the Central District of California charging
CODA in a single-count indictment with a violation of 18 U.S.C.
§ 1958 (Use of Interstate Commerce Facilities in the Commission

of Murder-for-Hire).  See <u>United States v. Coda</u>, No. 2:22-cr-
00474-JLS.

45.  As alleged in the indictment, which is incorporated
herein, beginning on an unknown date, but no later than on or
about February 3, 2022, and continuing until on or about March
1, 2022, in Los Angeles County, CODA knowingly used a facility
of interstate and foreign commerce, specifically, the Internet,
with the intent that the murder of victim W.D. be committed in
violation of the laws of the States of California and Louisiana.

**H.   <u>Search of the Redondo Beach Apartment</u>**

46.  On January 13, 2023, the Honorable Charles F. Eick,
U.S. Magistrate Judge, issued a search warrant for the Redondo
Beach Apartment in Case No. 2:23-MJ-00160.

47.  Pursuant to that warrant, I, alongside other FBI
agents, searched the Redondo Beach Apartment on January 18,
2023, and seized two iPhones, an iPad, and a black notebook.

48.  The forensic analysis of the digital devices seized
from the Redondo Beach Apartment is ongoing.

49.  On approximately March 14, 2023, I sent the PROVIDERS
a preservation letter requesting that information associated
with the SUBJECT ACCOUNTS be preserved for 90 days pursuant to
18 U.S.C. § 2703(f).

50.  Other than what has been described herein, to my
knowledge the United States has not attempted to obtain the
contents of the SUBJECT ACCOUNTS by other means.

## IV.   <u>SERVICES PROVIDED BY GOOGLE</u>

51.   Based on information CODA has provided to the FBI, as described above, SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 have signed up for Google email services.

52.   Based on a review of information provided by Google regarding its services, information provided by other law enforcement officers, and my training and experience, I am aware of the information contained in this section of the affidavit regarding Google.

53.   Google provides a variety of online services, many through Google Accounts, including email, document storage, mobile operating systems, translation services, software coding tools, malware analysis, social media accounts, applications development tools, video and photograph sharing and storage, web feed management tools, personalized home pages, news aggregation tools, a Google Account "dashboard" tool, an online retail storefront offering applications for free and for sale, website analytic tools, calendars, web browsers, mapping tools, location tracking tools, and telephone and voicemail transcription to the public.

54.   Google Calendar (Google's appointment book service) allows users to create events or RSVP to events created by others.  A single Google Account can set up multiple calendars. A calendar can be shared with other Google Accounts by the user or made public so anyone can access it.  Users also have the option to sync their device calendar so it is stored in Google Calendar.

55.  Google also offers numerous services which enhance the user's Internet experience, including Google Dashboard, Google Reader, Google News, and Google Groups.  Google News and the now-discontinued Google Reader are website feed aggregators that allowed a user to view website articles and news in one centralized location.  Google Groups are email groups whereby one person can send an email to an email address that serves as the "group," and the message or email is either or both posted to a centralized location and/or sent to everyone who is currently subscribed to the group via email; each group is generally set up using a Google account.

56.  Google also offers a service called Google Hangouts, which allows Google users to communicate by means of video calls, phone or audio calls, or written messages.

57.  Google also offers its own web browser -- Google Chrome -- which can be used instead of other web browsers such as Microsoft Internet Explorer or Mozilla Firefox.  Google Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access.  If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.  Users who have a Google Account can use Google Chrome on multiple devices and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices

running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating systems). Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes.

58. Users can obtain a Google Account by registering with Google. During the registration process, Google generally ask subscribers to provide certain personal identifying information when registering. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Google may also maintain a record of changes that are made to the information provided in subscriber records, such as to any other email addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

59. Evidence of who it is that a user of an account has contacted and for what purpose can also reside in the information likely stored on a SUBJECT ACCOUNT at Google. For example, photographs can be stored not only as attachments to emails, but they can be linked to a particular contact stored in connection with an email account, they can be stored in connection with a particular "friend" or event on a Google+ account, or they can be stored in a Google Photos (formerly

Picasa) web album.  Albums can be compiled for a particular trip
or occasion, documenting who was present, when it took place,
and where it was -- for example by recovering location
information that is sometimes stored in metadata, or what is
referred to as "EXIF data" on digital photographs.  Likewise,
personal videos can be uploaded to or downloaded from video
services such as Google's YouTube.  All of this data can assist
in identifying the true identity of the account user and persons
with whom the user of the account has been in contact.

60.  Aside from photos, the discontinued Google+, Google
Plusone, and iGoogle services were social networking services
similar to Facebook.  Data residing on Google+, Google Plusone,
and iGoogle accounts is likely to provide information regarding
the true identity of the person(s) using a SUBJECT ACCOUNT, the
identities of persons with whom the user of a SUBJECT ACCOUNT
has been in contact, the nature of those contacts, and whether
any such contacts were related to the subject matter of the
investigation described above.  Furthermore, a user's history
that relates to web browsing, web searches, and certain activity
related to Google services or applications (or "apps") are
stored in an account's Google History, or Google Web & App
Activity.

61.  In addition to storing photographs, calendars, and
other evidence related to social media, a subscriber can also
sign up for other services at Google, such as Google Drive and
Google Keep, which allow users to store any kind of documents.
Google Drive is a cloud storage service that allows users can

22

store an unlimited number of documents created by Google applications such as Google Docs, Google Sheets, Google Forms, and Google Slides.  Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit.  Users can set up their personal devices to automatically back up files to Google Drive.  Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment.  Google maintains records of changes to documents edited in Google applications.  Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment.

62.  A subscriber can also store with Google files in addition to emails or other messages, such as address books, contact or buddy lists, groups, social network links, calendar data, pictures or videos (other than ones attached to emails), notes, and other files, on servers maintained and/or owned by the PROVIDER.  In my training and experience, evidence of who was using an account may be found in such information.

63.  Providers like Google typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the

23

account.  In addition, email and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

64.  Google also collects and retains data about the location from which Google Account services are accessed on any mobile device.  According to Google, this location data may be associated with the Google Account signed-in or registered to the device if Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking.  The data retained includes precision location data, like latitude and longitude coordinates derived from GPS.

65.  In addition, Google Maps provides a mapping tool that allows users to search for addresses or points of interest, save locations (such as their home and work locations), create custom maps, make changes and edits to public places, "star" locations, and create private labels for locations.  Users can share their real-time location with others through Google Maps by using the Location Sharing feature.  Users could find and plan an itinerary using the discontinued Google Trips, whose functionality is now part of Google Travel.  Google Location History provides Global Positioning System (GPS) location information.  All of these services can be used to identify

where an individual is and has been physically located.  Google also in some instances maintains records of the nearby wireless or "Wi-Fi" access points (that can be used to connect to the Internet) or the cellular towers connected to a device that is accessing a Google Account.

66.  Google offers services which interpret and translate text, including Google Translate (which allow users to paste text in one language that will be translated into another) and Google Translator Toolkit (which includes more functionality and collaboration), which can translate text in over 100 languages. The translation service is Internet-based, so it can be used by the user of the account to translate emails received as well as websites visited.

67.  Over the last several years, Google has developed a number of mobile telephone and voicemail technologies, including the development of the Android mobile operating system, Android Market, Google Voice, and the discontinued Google Talk.  The Android operating system is used on the majority of the world's touch-screen mobile devices and smartphones, and facilitates the downloading and running of games and applications, sending of text and voice messages, connecting to and searching the Internet, and providing of GPS and location services, camera services for the taking of photographs and videos (including video calling), clock and calendar services, and email services, and storing of contact lists and documents.  The Google Play service provides the virtual storefront at which applications can be downloaded and updated.  I know from experience that

25

Android applications including these are generally downloaded
from the Android Market and Google Play services.  Through
Google Voice, users can be assigned a telephone number that can
be used to make, record, and forward phone calls and send,
receive, store, and forward SMS and MMS messages from a web
browser, mobile phone, or landline.  Google Voice also includes
a voicemail service.  Google Talk was an instant messaging
service that provided both text and voice communication.

68.  Google also uses "unique application numbers," which
Google uses to record information such as the operating system
type and the application version number used to access Google by
a particular device.  Google maintains these unique application
numbers to track and collect information related to a particular
device accessing Google services, which is recognized when
updating Google services or software on a device using a Google
Account.

69.  Google can also track users across various devices,
services, and "apps."  One way that it does so is by assigning a
Google Accounts and ID Administration ("GAIA") ID.  Google is
therefore able to determine when activities are connected to
that GAIA ID.

70.  Google also now offers users the ability to exercise
certain control over email messages, for example by allowing
users to send expiring messages, to require a recipient to
insert a password to open a message, to retract access to a sent
message, or to control whether a recipient can forward a
message.

71.   Depending on whether a user of a Google Account implemented Google's two-factor authentication system (which can require the user to enter both a username and password and a code sent to one's cell phone), Google may also have authentication logs of when the user successfully authenticated or identified him- or herself when logging into an account. Similarly, for certain mobile devices, a password for the specific "app" installed on the mobile device may be generated and used to maintain access.

72.   In some cases, users may communicate directly with Google about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Providers like Google typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

73.   I have also learned that providers of email and social media services often track the behavior and activities of persons using accounts by using cookies, which are strings of characters and numbers stored on a person's computer on their web browser.  These cookies can often show whether more than one account was accessed by the same computer (and specifically the same web browser), as the provider can recognize that cookie when the same device returns to the service to access an account.

74.    In order to identify other accounts used or maintained by the user of a SUBJECT ACCOUNT, the warrant also calls for the PROVIDER to disclose both (1) any cookies associated with the SUBJECT ACCOUNT, i.e., those cookies that were placed on any computers or web browsers (for example, Internet Explorer or Google Chrome) used to access the SUBJECT ACCOUNT, and (2) the identity of any other account in which the same cookie or cookies used to access the SUBJECT ACCOUNT was/were recognized. If in the course of the investigation the digital devices used by the subject(s) of the investigation are found, they can be searched to determine if the cookies recognized by the provider are stored on those devices.  The warrant also calls for the PROVIDER to identify any other accounts accessed by any computer or web browser using the same cookies as the SUBJECT ACCOUNT by providing subscriber records and log-in information for those other accounts (but not to provide the contents of communications in those other accounts).

75.    For the foregoing reasons, Attachment B-1 in the requested warrant to Google requires Google to provide information related to any Google service used by a SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2, as the user of SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 may have enrolled in new services since CODA provided the information to the FBI about her use of SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 as described above.

### V.   SERVICES PROVIDED BY APPLE, INC.

76.  Based on information CODA has provided to the FBI and information learned from Coinbase, as described above, SUBJECT ACCOUNT 3 has signed up for Apple email services.

77.  Based on a review of information provided by Apple regarding its services, information provided by other law enforcement officers, and my training and experience, I am aware of the information contained in this section of the affidavit regarding Apple.

78.  Apple is a United States consumer electronics company that produces devices, including the iPhone, iPad, iPod Touch, Apple Watch, and Apple TV all of which use Apple operating system software (including iOS, iPadOS, watchOS, and tvOS), as well as desktop and laptop computers, which use the Mac OS operating system.

79.  Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

80.  Apple provides email service to its users through email addresses at the domains mac.com, me.com, and icloud.com.

81.  iMessage and FaceTime allow users of Apple devices to communicate with each other in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video

29

calls.  The iMessage and FaceTime services are exclusive to
Apple devices.

82.  iCloud is a file hosting, storage, and sharing service
provided by Apple.  iCloud can be utilized through numerous
iCloud-connected services and can also be used to store Apple
device backups and data associated with third-party apps.

83.  iCloud-connected services allow users to create,
store, access, share, and synchronize data on Apple devices or
via icloud.com on any Internet-connected device.  For example,
iCloud Mail enables a user to access Apple-provided email
accounts on multiple Apple devices and on icloud.com.  iCloud
Photo Library and My Photo Stream can be used to store and
manage images and videos taken from Apple devices, and iCloud
Photo Sharing allows the user to share those images and videos
with other Apple subscribers.  iCloud Drive can be used to store
presentations, spreadsheets, and other documents.  iCloud Tabs
enables iCloud to be used to synchronize webpages opened in the
Safari web browsers on all of the user's Apple devices.  iWork
Apps, a suite of productivity apps (Pages, Numbers, and
Keynote), enables iCloud to be used to create, store, and share
documents, spreadsheets, and presentations.  iCloud Keychain
enables a user to keep website username and passwords, credit
card information, and Wi-Fi network information synchronized
across multiple Apple devices.  iCloud can also be used to back
up various settings and history of a user's activity, such as
searches and web history.

84.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

85.  Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and (in some instances) wipe the contents of devices registered with the service.

86.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

87.  The App Store and iTunes Store are used to purchase and download digital content.  Apps can be purchased and downloaded through the App Store on Apple devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store.

88.  Apple services are accessed through use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

89.  An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as

Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

90.  Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

91.   Additional information is captured by Apple in
connection with the use of an Apple ID to access certain
services.  For example, Apple maintains connection logs with IP
addresses that reflect a user's sign-on activity for Apple
services such as iTunes Store and App Store, iCloud, Game
Center, and the My Apple ID and iForgot pages on Apple's
website.  Apple also maintains records reflecting a user's app
purchases from App Store and iTunes Store, "call invitation
logs" for FaceTime calls, and "mail logs" for activity over an
Apple-provided email account.  Records relating to the use of
the Find My service, including connection logs and requests to
remotely lock or erase a device, are also maintained by Apple.

92.   Apple also maintains information about the devices
associated with an Apple ID.  When a user activates or upgrades
an Apple device, Apple captures and retains the user's IP
address and identifiers (depending on the type of device) such
as the Integrated Circuit Card ID number ("ICCID"), which is the
serial number of the device's SIM card.  Similarly, the
telephone number of a user's iPhone is linked to an Apple ID
when the user signs into FaceTime or iMessage.  Apple also may
maintain records of other device identifiers, including the
Media Access Control address ("MAC address"), the unique device
identifier ("UDID"), and the serial number.  In addition,
information about a user's computer is captured when iTunes is
used on that computer to play content associated with an Apple
ID, and information about a user's web browser may be captured
when used to access services through icloud.com and apple.com.

Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

93.  Apple provides users with five gigabytes of free storage space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

94.  In some cases, users may communicate directly with Apple about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.

Providers like Apple typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

95.   In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

96.   For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

97.   In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with

the foregoing, such as geo-location, date and time) may be
evidence of who used or controlled the account at a relevant
time.  As an example, because every device has unique hardware
and software identifiers, and because every device that connects
to the Internet must use an IP address, IP address and device
identifier information can help to identify which computers or
other devices were used to access the account.  Such information
also allows investigators to understand the geographic and
chronological context of access, use, and events relating to the
crime under investigation.

     98.  Account activity may also provide relevant insight
into the account owner's state of mind as it relates to the
offenses under investigation.  For example, information on the
account may indicate the owner's motive and intent to commit a
crime (e.g., information indicating a plan to commit a crime),
or consciousness of guilt (e.g., deleting account information in
an effort to conceal evidence from law enforcement).

     99.  Other information connected to an Apple ID may lead to
the discovery of additional evidence.  For example, the
identification of apps downloaded from the App Store and iTunes
Store may reveal services used in furtherance of the crimes
under investigation or services used to communicate with co-
conspirators.  In addition, emails, instant messages, Internet
activity, documents, and contact and calendar information can
lead to the identification of co-conspirators and
instrumentalities of the crimes under investigation.

100. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users

## VI.  <u>BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDERS</u>

101. I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of

the account.  Therefore, the contents of a given account, including the email addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDERS to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachments B-1 and B-2 for review by the search team.

102. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

103. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the

computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachments B-1 and B-2, is necessary to find all relevant evidence within the account.

104. This application seeks a warrant to search all responsive records and information under the control of the PROVIDERS, which are subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

105. As set forth in Attachments B-1 and B-2, I am requesting a warrant that permits the search team to keep the original production from the PROVIDERS, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the

original production is destroyed, it may be impossible for the
provider to examine a particular document found by the search
team and confirm that it was a business record of the provider
taken from a SUBJECT ACCOUNT.

       b.   I also know from my training and experience that
many accounts are purged as part of the ordinary course of
business by providers.  For example, if an account is not
accessed within a specified time period, it -- and its contents
-- may be deleted.  As a consequence, there is a risk that the
only record of the contents of an account might be the
production that a provider makes to the government, for example,
if a defendant is incarcerated and does not (perhaps cannot)
access his or her account.  Preserving evidence, therefore,
would ensure that the government can satisfy its Brady
obligations and give the defendant access to evidence that might
be used in his or her defense.

//
//
//
//
//
//
//
//
//
//

## VII. <u>CONCLUSION</u>

106. Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDERS.  Because the warrant will be served on the PROVIDERS, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2023.


_____
HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE